UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF CONNECTICUT

THOMAS E. PEREZ, SECRETARY OF LABOR,
United States Department of Labor,

*Plaintiff*,

v.

EASTERN AWNING SYSTEMS, INC., and
STEPHEN P. LUKOS, an individual

*Defendants*.

Civil Action No. 15-1692

**COMPLAINT AND REQUEST FOR JURY TRIAL**

Plaintiff Thomas E. Perez, the Secretary of Labor ("Secretary"), alleges as follows:

**I.    Jurisdiction and Venue**

1.    This action arises under § 11(c) of the Occupational Safety and Health Act of 1970, 29 U.S.C. § 651 *et seq*. (the "Act"). Among other things, § 11(c)(1) of the Act prohibits discharge of or discrimination against "any employee because such employee has filed any complaint or instituted or caused to be instituted any proceeding under or related to th[e] Act." 29 U.S.C. § 660(c)(1). Section 11(c)(2) states that the Secretary may bring an action against any person that violates § 11(c)(1) in the appropriate district court, which "shall have jurisdiction" to "order all appropriate relief." *Id.* § 660(c)(2).

2.    Jurisdiction is established pursuant to the above-mentioned 29 U.S.C. § 660(c)(2) and 28 U.S.C. § 1331.

3.    Venue is established in this judicial district pursuant to 28 U.S.C. § 1391(b). Defendants Eastern Awning Systems, Inc. ("Eastern Awning") and Stephen P. Lukos

("Lukos") have a regular place of business and transact substantial business on an ongoing basis in this judicial district.

## II. Background

4. Eastern Awning is a business that manufactures and distributes certain types of awnings, including retractable fabric patio awnings. Eastern Awning is registered as a corporation in Connecticut and has a business address and principal place of operations at 843 Echo Lake Road, Watertown, CT, 06795.

5. At all times material hereto, Lukos was the owner, the President, and a Director of Eastern Awning.

6. At all times material hereto, Eastern Awning and Lukos were each a person as defined by section 3(4) of the Act, 29 U.S.C. § 652(4).

7. As of June 2009, and at all times material thereafter, including from June 15, 2009 to August 28, 2009, Lukos made all hiring and firing decisions for Eastern Awning.

8. At all times material hereto, including June 15, 2009 to August 28, 2009, Mary DeLeon ("DeLeon") and Francis Espinal ("Espinal") were employees as defined by section 3(6) of the Act, 29 U.S.C. § 652(6), who were employed by Eastern Awning, an employer as defined by section 3(5) of the Act, 29 U.S.C. § 652(5).

9. As of June 15, 2009, DeLeon received approximately $464 per week in wages for the work she did for Eastern Awning (approximately $14.50 per hour for thirty-two hours per week).

10. As of June 15, 2009, Espinal received approximately $312 per week in wages for the work he did for Eastern Awning (approximately $13.00 per hour for twenty-four hours per week).

11. As of June 15, 2009, DeLeon and Espinal had each been an employee of Eastern Awning for more than three years.

12. As of June 15, 2009, and continuing through August 28, 2009, Eastern Awning employed fewer than 20 people, including DeLeon and Espinal.

13. As of June 2009, DeLeon and Espinal sometimes worked in the powder coat room at Eastern Awning. When they worked in the powder coat room, their duties included taking a metal part, washing it, applying a powder to it, and then placing the part into an oven to cure the coating.

14. As of June 15, 2009, Dennis Lynn ("Lynn") was an Eastern Awning employee who had managerial responsibilities, which included supervising both DeLeon and Espinal.

15. On June 15, 2009, Lynn was responsible for supervising operations in the powder coat room. In that capacity, Lynn reported directly to Lukos.

16. As of June 15, 2009, Lukos's policy was that only he himself could authorize the opening of the window or the turning on of the ventilation system in the powder coat room. Lukos's stated reason for this policy was that he wanted to avoid the increased heating/cooling costs that could potentially result if the window were open or the ventilation system were on.

17. As of June 15, 2009, Lukos had communicated his policy concerning the powder coat room window and ventilation system to Lynn, who understood that he was not authorized to open the window or turn on the ventilation system without permission from Lukos.

3

18. As of June 15, 2009, John Siddons ("Siddons") was an Eastern Awning employee who also had managerial responsibilities, which included supervising both DeLeon and Espinal.

19. As of June 15, 2009, Siddons served as an assistant manager to Lynn.

20. As of June 15, 2009, DeLeon and Espinal had established reputations as good workers at Eastern Awning.

### III. Defendants *willfully* exposed DeLeon and Espinal to unsafe working conditions on June 15, 2009.

21. On June 15, 2009:

   a. Lynn directed DeLeon and Espinal to work in the powder coat room at Eastern Awning.

   b. When DeLeon and Espinal began working in the powder coat room on the morning of June 15, the window was closed and the ventilation system was off, since Lukos had not approved otherwise.

   c. After working in the powder coat room for approximately two hours, DeLeon and Espinal each began to experience irritation of the throat and eyes. They also noticed a strange smell in the powder coat room.

   d. After approximately 2-3 hours, DeLeon and Espinal felt nauseous as a result of the conditions in the powder coat room.

   e. DeLeon eventually vomited as a result of the conditions in the powder coat room.

   f. After approximately several hours, DeLeon reported the conditions in the powder coat room to Lynn.

g.  After DeLeon informed Lynn about the conditions in the powder coat room, Lynn went to the room and observed the conditions there himself. Lynn did not change the conditions in the powder coat room. He also had DeLeon and Espinal continue working there.

h.  Lynn stated that only Lukos could open the window or turn on the ventilation system in the powder coat room. Lynn further stated that anyone who opened the window or turned on the ventilation system without permission would be sent home.

i.  At one point, Jason Allard, another employee who worked at Eastern Awning's location, stopped by the powder coat room and observed the conditions therein. Allard then also brought the conditions to Lynn's attention. Again, Lynn did not change the conditions in the powder coat room. He also had DeLeon and Espinal continue working there.

j.  DeLeon eventually went directly to Lukos and told him about the conditions in the powder coat room.

k.   After DeLeon informed Lukos about the conditions in the powder coat room, Lukos went to the room and observed the conditions there himself.

l.  After observing the conditions in the powder coat room, Lukos (1) directed that an intake on the side of the oven be cleaned, and (2) authorized the opening of the window. Lukos refused to allow the turning on of the ventilation system. Lukos stated that he did not want to turn on the ventilation system in the powder coat room because doing so would "cost him money," or words to that effect.

      m. Lukos had DeLeon and Espinal continue working in the powder coat room with the window open and the ventilation system off. When DeLeon again complained about the conditions in the powder coat room, Lukos again refused to authorize turning on the ventilation system.

      n. Eventually DeLeon and Espinal decided to stop working in the powder coat room and seek medical attention. They told Lynn they were unable to continue working in the powder coating room any more that day.

      o. DeLeon and Espinal left Eastern Awning and went to the emergency room at St. Mary's Hospital in Waterbury, CT.

22. Due to the injuries she sustained on June 15, 2009, DeLeon was not able to work from June 16 until on or about June 24, 2009.

23. Due to the injuries he sustained on June 15, 2009, Espinal was not able to work from June 16 until on or about August 26, 2009.

24. On or about June 19, 2009, DeLeon and Espinal filed health and safety complaints with OSHA concerning the powder room conditions they had worked in on June 15, 2009.

25. OSHA conducted Inspection No. 311763486, which resulted in the issuance of a multiple-item Citation on or about December 3, 2009. As amended, this Citation became a final order of the Occupational Safety and Health Review Commission on or about June 21, 2010. (OSHRC Docket No. 10-0083) As amended, the Citation included multiple Serious violations relating to conditions in the powder coat room. The amended Citation also included a Willful violation of 29 C.F.R. § 1910.107(l)(3) — specifically, the Citation stated that Eastern Awning failed to "meet the provisions of the Standard for ovens and furnaces,"

6

including in regard to the "Powder Coating Area," where "[o]n or about 6/15/2009, employees were exposed to an inhalation hazard due to improper and/or lack of commissions, operation, inspection, testing, and maintenance of the . . . [oven]."

26. Eastern Awning paid a total penalty of $17,500 in connection with the above-referenced Citation.

**IV.  Defendants wrongfully terminated DeLeon and Espinal for submitting the above-mentioned health and safety complaints to management and OSHA.**

27. After she left the powder coat room at Eastern Awning on June 15, 2009 to seek medical treatment at the emergency room at St. Mary's Hospital, DeLeon was not medically cleared to return to work at Eastern Awning until late June of 2009, at which time she returned.

28. By June 26, 2009, both Eastern Awning and Lukos knew that health and safety complaints had been filed with OSHA concerning employees who had reported suffering injury as a result of working in the powder coat room at Eastern Awning.

29. As of late June 2009, there were only two Eastern Awning employees in 2006, 2007, 2008, and the first half of 2009 who reported suffering injury as a result of working in the powder coat room — specifically, DeLeon and Espinal on June 15, 2009.

30. On or about June 29, 2009, an OSHA inspector visited Eastern Awning in connection with the complaint OSHA received on June 19, 2009 concerning the powder coat room. The OSHA inspector spoke with both Lukos and Siddons, as well as Lukos's mother, who also sometimes worked at Eastern Awning.

31. On or about July 7, 2009, an OSHA inspector again visited Eastern Awning. The OSHA inspector again spoke with Lukos.

7

32. On the evening of July 23, 2009, DeLeon was exposed to pepper spray or a similar such substance while she was off-duty and away from Eastern Awning. On July 24, 2009, DeLeon's eyes continued to be irritated as a result of this exposure. Since DeLeon was scheduled to work at Eastern Awning on July 24, 2009, she ensured that Eastern Awning received notification that she was unable to report to work as a result of her irritated eyes.

33. From July 24, 2009, through August 25, 2009, neither Eastern Awning nor Lukos raised with DeLeon any issue concerning her July 24, 2009 absence.

34. After missing work on July 24, 2009, DeLeon returned to work and worked her usual schedule until August 4, 2009, when she missed a second day of work because of a medical appointment. DeLeon then returned to work and worked her usual schedule through August 24, 2009.

35. At some point between June 15, 2009, and August 25, 2009, Siddons took over Lynn's management job, and Lynn moved into a less-managerial role. In this new capacity, Siddons reported directly to Lukos. Siddons's duties in his new job included supervising DeLeon and Espinal, to include whether they were present for work as scheduled. Generally, if an employee were absent, a supervisor (e.g., Siddons) would fill out an absentee form. Lukos reviewed the absentee forms and made decisions about how and whether to discipline employees for absences.

36. On August 26, 2009, DeLeon reported for work as scheduled. Eastern Awning, however, informed her that she would not be allowed to work until she provided documentation concerning her August 4, 2009 absence. DeLeon obtained a note from her doctor and gave it to Eastern Awning that same day.

8

37. On August 26, 2009, Eastern Awning informed DeLeon that she also needed to provide documentation concerning her July 24, 2009 absence. DeLeon explained that she could not do that because she had not physically visited a doctor's office in connection with her July 23, 2009 injury; rather, all that had occurred was that a clinic had been called and it did not make sense for her to drive, or words to that effect. Eastern Awning, however, continued to require that DeLeon had to provide documentation. Since DeLeon was unable to do so, Eastern Awning refused to let her work on August 26.

38. On or about August 27, 2009, OSHA again visited Eastern Awning. The OSHA inspector met with Lukos concerning the June 19, 2009 safety and health complaint that had been submitted to OSHA. Among other things, the OSHA inspector discussed with Lukos the complaint items, the inspection process, and policies concerning photographs and interviews. The OSHA inspector also explained to Lukos that section 11(c)(1) of the Act prohibited retaliation against anyone suspected of having complained to OSHA.

39. During the August 27, 2009 visit to Eastern Awning, the OSHA inspector asked Lukos if he could interview the Eastern Awning employees who worked in the powder room. In response, Lukos stated that, due to market conditions and business decisions, there were no such employees on site. Lukos further stated he would have to hire some new workers to do the powder coating.

40. On or about August 27, 2009, an OSHA inspector asked Lukos for Eastern Awning's OSHA-300 Forms for 2009, as well as the preceding three years. (The OSHA-300 Form is a log of work-related injuries and illnesses reported by employees in a particular calendar year.) Lukos eventually provided OSHA-300 forms for 2006, 2007, 2008, and 2009 through July. The only two injuries reported on these forms in connection with the powder

9

coat room were those of DeLeon and Espinal on June 15, 2009. DeLeon's and Espinal's June 15, 2009 injuries were also the only incidents in which employees reported eye and throat irritation.

41. When DeLeon reported to work on August 28, 2009 (i.e., the next day on which she was scheduled to work), Eastern Awning again refused to let her work because she had not provided documentation for July 24. When DeLeon asked whether she was being let go from Eastern Awning, she was told that she was, or words to that effect.

42. After being medically cleared, Espinal attempted to return to work at Eastern Awning on August 28, 2009. Eastern Awning told Espinal he could not work until he spoke with Lukos, who was unavailable to see him. As a result, Eastern Awning did not let Espinal work on August 28, 2009.

43. Espinal called Lukos on the telephone multiple times following August 28, 2009 but Espinal was never able to reach him. Consequently, Espinal was not able to return to work at Eastern Awning.

44. On or about August 26, 2009, Eastern Awning sent a letter to Espinal inviting him to return to work on August 31, 2009. The letter, however, was returned to Eastern Awning as undeliverable.

45. Even though DeLeon informed Eastern Awning on or about September 4, 2009 that the address the company had on file for Espinal was wrong and provided the company with Espinal's new address, neither Eastern Awning nor Lukos attempted to thereafter contact Espinal at the correct address.

46. After Eastern Awning would not allow DeLeon to work on August 28, 2009, DeLeon filed for unemployment benefits. Eastern Awning opposed her request by

contending that DeLeon was discharged for misconduct — specifically, absenteeism on July 24, 2009. After the administrator rejected Eastern Awning's position in October 2009, Eastern Awning appealed. The appeals referee heard Eastern Awning's appeal in February 2010 and issued a Decision in March 2010. (State of Connecticut, Employment Security Appeals Division, Case No. 3828 EE 09) Like the administrator, the appeals referee found for DeLeon and ruled against Eastern Awning. The March 3, 2010 Decision of the Appeals Referee specifically concluded that Eastern Awning's contention that DeLeon was fired for being absent on July 24 was a "pretext":

> [Eastern Awning] was unable to explain why it accepted [DeLeon's] excuse for the absence on July 24, 2009 for nearly one month and subsequently demanded a note in lieu of discharge. The referee does not find it likely that [DeLeon] would misrepresent contact with her medical provider since she was aware that the employer often required documentation when she indicated she visited her provider. It is not beyond the realm of reason that a brief call about irritated eyes might be addressed casually when the source of the irritation was known. The evidence indicates that [Eastern Awning] . . . was suspicious that [DeLeon] filed an OSHA complaint. These circumstances, combined with the length of time [Eastern Awning] waited before demanding an excuse for July 24, 2009 forces the referee to conclude that the discharge was a pretext for other issues unrelated to her attendance.

47. Espinal also filed for unemployment after Eastern Awning refused to let him work on August 28, 2009. Eastern Awning did not assert that Espinal's claim should be denied because he was discharged for absenteeism or other misconduct.

48. On or about October 19, 2009, Eastern Awning's then-counsel offered Espinal reinstatement via OSHA.

49. Neither Eastern Awning nor Lukos ever offered reinstatement to DeLeon.

50. From January 1, 2007 to August 25, 2009, Eastern Awning and Lukos did not impose uniform consequences on employees who were late to work or who did not show up

11

for work when scheduled.

      a. Sometimes an employees who showed up late was sent home and not allowed to work that day. At other times, an employee who showed up late was allowed to work.

      b. Sometimes when an employee telephoned to say he or she would not be at work on a particular day, Eastern Awning and Lukos required the employee to provide documentation. At other times, employees who missed work were not required to provide such documentation — including, for example: (1) when certain employees called in sick; (2) when certain employees stated that they had overslept; (3) when certain employees stated that they had child care or other family care issues; and (4) when certain employees stated that they had transportation issues (e.g., car trouble).

51. From January 1, 2007 to August 25, 2009, neither Eastern Awning nor Lukos ever terminated anyone's employment for missing a day of work, or for failing to provide medical documentation.

52. Neither Eastern Awning nor Lukos ever terminated an employee for being absent and failing to call ("no call/no show") between January 1, 2007 and August 25, 2009.

53. Neither Eastern Awning nor Lukos ever terminated an employee who requested leave, had it denied, and then chose to be absent anyway between January 1, 2007 and August 25, 2009.

### V.   DeLeon and Espinal suffered emotional distress as a result of their wrongful termination by Defendants.

54. As of August 28, 2009 (i.e., when she was terminated), DeLeon was married

12

and had two children. She depended on her income from Eastern Awning to help pay her bills.

55. DeLeon suffered emotional distress as a result of being terminated from her job at Eastern Awning on August 28, 2009. She continued to experience stress while she looked for a similar job, which she did not find until on or about April 26, 2012, when she began working at Toff Industries, Inc. Each of the following further added to her stress:

  a. In late 2009, DeLeon was unable to pay her rent, and her landlord initiated an eviction process against her.

  b. DeLeon struggled to buy groceries for her family and sought access to her church's food bank.

  c. DeLeon struggled to buy her children's clothing at the start of the school year in the fall of 2009.

  d. DeLeon struggled to pay for gas.

  e. DeLeon had to ask her family for financial support.

56. Had DeLeon not been terminated from Eastern Awning, she would have been paid wages from on or about August 28, 2009 (when she was terminated) to on or about April 26, 2012 (when she began working at Toff).

57. Espinal also experienced emotional distress when he was terminated from his job at Eastern Awning.

58. Had Espinal not been terminated from Eastern Awning, he would have been paid wages from on or about August 28, 2009 (when he was terminated) to on or about October 19, 2009 (when counsel for Defendants offered re-instatement).

**VII.   The Secretary contends that Defendants violated section 11(c) of the Act.**

59. On September 1, 2009, DeLeon filed a whistleblower complaint with the Secretary alleging retaliatory discrimination and retaliatory discharge. This complaint was timely filed in accordance with section 11(c)(2) of the Act, 29 U.S.C. §660(c)(2).

60. On September 17, 2009, Espinal filed a whistleblower complaint with the Secretary alleging retaliatory discrimination and retaliatory discharge. This complaint was also timely filed in accordance with section 11(c)(2) of the Act, 29 U.S.C. §660(c)(2).

61. The Secretary investigated both DeLeon's September 1, 2009 whistleblower complaint and Espinal's September 17, 2009 whistleblower complaint and determined that Lukos and Eastern Awning violated the provisions of section 11(c)(1) of the Act with respect to each.

62. Specifically, Eastern Awning and Lukos wrongfully discharged DeLeon and Espinal on or about August 28, 2009 because DeLeon and Espinal filed safety and health complaints related to the Act concerning the working conditions they were required to endure at Eastern Awning on June 15, 2009, and/or their exercise of rights afforded by the Act, all in violation of section 11(c)(1) of the Act, 29 U.S.C. § 660(c)(1).

**PRAYER FOR RELIEF**

WHEREFORE, the Secretary prays that this Court:

1. Adjudge that Eastern Awning and Lukos wrongfully discharged DeLeon and Espinal because they filed safety and health complaints related to the Act, and/or they exercised rights afforded by the Act, all in violation of section § 11(c)(1) of the Act, 29 U.S.C. § 660(c)(1);

2. Permanently enjoin and Eastern Awning and Lukos, as well as their agents, servants, employees and all persons acting or claiming to act on their behalf and interest, from violating the provisions of section § 11(c)(1) of the Act, 29 U.S.C. § 660(c)(1);

3. Grant all appropriate relief, including without limitation:

    a. Requiring Eastern Awning and Lukos to pay DeLeon and Espinal's lost wages, as well as the interest thereon;

    b. Requiring Eastern Awning and Lukos to pay any other damages relating to their actions, to include compensatory damages (for example, damages in connection with the emotional distress that resulted from the alleged wrongful termination);

    c. Require Eastern Awning and Lukos to pay punitive damages;

    d. Requiring that Eastern Awning and Lukos post in a prominent location at the Eastern Awning worksite for 60 consecutive days a notice easily seen and readable by employees that Eastern Awning and Lukos will not in any manner discriminate against employees because of such employees' engagement in activities protected by section 11 (c) of the Act;

    e. Requiring Eastern Awning and Lukos to pay the costs of this action; and

    f. Granting such other relief as is just and proper.

## REQUEST FOR JURY TRIAL

The Secretary respectfully requests trial by jury on all issues so triable.

                              Respectfully submitted,

                              M. Patricia Smith
                              Solicitor of Labor

                              Michael D. Felsen
                              Regional Solicitor

                              */s/ Nathan C. Henderson*_____
                              Kelly Lawson (MA BBO No. 650410)
                              Counsel for Civil Rights
                                    lawson.kelly@dol.gov
                              Nathan C. Henderson (MA BBO No. 657763)
                                    Trial Attorney
                                    henderson.nathan.c@dol.gov

                              Attorneys for Plaintiff,
                              U.S. DEPARTMENT OF LABOR

                              Office of the Solicitor
                              JFK Federal Building, Room E-375
                              Boston, MA  02203
                              TEL: 617.565.2500
                              FAX: 617.565.2142

Date:  November 18, 2015