UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| THOMAS E PEREZ, SECRETARY OF LABOR, United states Department of Labor<br>  *Plaintiff*,<br><br>v.<br><br>EASTERN AWNING SYSTEMS, INC., and STEPHEN P. LUKOS, an individual,<br>  *Defendants*. | No. 3:15-cv-01692 (MPS) |
|---|---|

**RULING ON MOTION FOR SUMMARY JUDGMENT**

Plaintiff, Secretary of Labor Thomas E. Perez, alleges that Defendants Eastern Awning Systems, Inc. and Stephen P. Lukos, its president ("Defendants"), discharged two Eastern Awning employees in retaliation for filing health and safety complaints under the Occupational Safety and Health Act of 1970, in violation of section 11(c) of that act, codified at 29 U.S.C. § 660(c)(1). Defendants now move for summary judgment on the basis of the Secretary's six-year delay in bringing the case or, in the alternative, on the Secretary's substantive claims. I find that there are material questions of fact as to the Defendants' delay defense and the Secretary's retaliation claims. Defendants' motion is therefore DENIED.

**I. Factual Background**

The following facts are taken from the parties' Local Rule 56(a) statements and are undisputed except where otherwise noted.

Eastern Awning Systems, Inc. ("Eastern Awning") is a Connecticut corporation that manufactures retractable patio awnings. (Defendants' Local Rule 56(a)1 Statement ¶ 1, ECF No. 76) ("56(a)1 Stmt."). Stephen Lukos is the President of Eastern Awning and made all hiring and firing decisions at the times relevant to the complaint. (*Id.* ¶ 1-3.) In June 2009, Mary DeLeon and

1

Francis Espinal were employees of Eastern Awning (*id.* ¶ 4), and both had "established reputations as good workers." (Plaintiff's Local Rule 56(a)2 Statement at 6 ¶ 1, ECF No. 79-32) ("56(a)2 Stmt.").

On June 15, 2009, DeLeon and Espinal were working in the powder coat room at Eastern Awning. (*Id.* ¶ 2.) Their duties included applying powder to metal parts and placing them in an oven to cure the powder coating. (*Id.*) The parties dispute the details of what occurred that day. DeLeon recounted in her interviews with the Occupational Safety and Health Administration that she began to experience a "burning sensation" and asked to turn on the ventilation system. (ECF No. 79-1 at 5.) Her supervisor told her that Lukos would not permit anyone to turn on the ventilation system. (*Id.*) DeLeon felt increasingly ill as the day went on. (*Id.* at 6.) She approached Lukos on her lunch break to plead with him to address the issue. (*Id.*) He told her to "stop being a crybaby about it." (*Id.*) She left the area and vomited. (*Id.*) She eventually convinced Lukos to enter the powder room. (*Id.*) He acknowledged the problem and allowed them to open a window. (*Id.*) DeLeon continued to feel sick, vomiting twice more. (*Id.*) It is undisputed that she and Espinal eventually left to seek medical attention. (56(a)1 Stmt. ¶ 7.) DeLeon filed a complaint with OSHA on June 19. (ECF No. 179-13 ¶ 4.)

DeLeon was medically cleared returned to work on June 24. (56(a)1 Stmt. ¶ 8.) She worked a normal schedule from June 24 through August 24 apart from two absences. (*Id.* ¶ 10-11.) On July 24, she reported to her supervisor that she was exposed to pepper spray outside of work the prior evening and her eyes were still too irritated to work. (*Id.* ¶ 10.) She missed work a second time for a medical appointment on August 4. (*Id.*) On August 26, DeLeon reported for her shift, but was told she could not work until she provided documentation for her August 4 absence. (*Id.* ¶ 13.) She obtained a note from her doctor and attempted to return to work the same day. (*Id.*) Her

supervisor informed her she still could not return, this time until she provided documentation for her July 24 absence. (*Id.* ¶ 14.)

The record on Francis Espinal is less clear. The parties agree that Espinal did not return to work "from June 16 until on or about August 26, 2009." (56(a)1 ¶ 9.) The Secretary asserts that the record shows Espinal returned to Eastern Awning in late August, but was told he could not begin work until he met with Lukos. (56(a)2 ¶ 45.) He attempted to call or meet with Lukos "approximately a half-dozen" times, but was told that Lukos was busy. (56(a)2 ¶ 46.) It is undisputed that on August 26, Eastern Awning sent a certified letter to Espinal informing him that he could return to work on August 31, but the letter was returned as undeliverable. (56(a)1 ¶ 15.) The Secretary asserts that DeLeon informed Eastern Awning of Espinal's proper address on September 4, but Eastern Awning did not attempt to send a second letter. (56(a)2 ¶ 44.) The parties agree that Eastern Awning offered to reinstate Espinal "via OSHA" on October 19, 2009 after it was informed that he had filed a retaliation complaint. (56(a)1 ¶ 16.)

Additional disputed facts are incorporated as relevant in the discussion below.

## II. Legal Standard

"Summary judgment is appropriate only if the movant shows that there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law." *Tolan v. Cotton*, 134 S.Ct. 1861, 1866 (2014) (internal quotation marks and citations omitted). "In making that determination, a court must view the evidence in the light most favorable to the opposing party." *Id*. (quotation marks omitted). On summary judgment a court "must resolve all ambiguities and draw all reasonable inferences against the movant." *Caronia v. Phillip Morris USA, Inc.*, 715 F.3d 417, 427 (2d Cir. 2013). The moving party bears the burden of demonstrating that no genuine issue exists as to any material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–25 (1986). If the

moving party carries its burden, "the opposing party must come forward with specific evidence demonstrating the existence of a genuine dispute of material fact." *Brown v. Eli Lilly & Co.*, 654 F.3d 347, 358 (2d Cir. 2011).

## III. Discussion

### A. Laches

#### 1. Availability of Laches for Retaliation Claims Brought by the Government

Defendants first move for dismissal on the basis of laches. Laches is an affirmative defense based on the maxim that "equity aids the vigilant, not those who sleep on their rights." *Ivani Contracting Corp. v. City of New York*, 103 F.3d 257, 259 (2d Cir. 1997) (quotation marks omitted). The Secretary argues that laches is not a defense to a section 11(c) retaliation claim. (ECF No. 79 at 3.) "It is well settled that the United States is not bound by state statutes of limitation or subject to the defense of laches in enforcing its rights." *United States v. Summerlin*, 310 U.S. 414, 416 (1940). Thus, while courts will, in the absence of a federal statute of limitations, refer to a statute of limitations based on analogous state law for federal causes of action brought by private parties, *see Johnson v. Ry. Exp. Agency, Inc.*, 421 U.S. 454, 462 (1975) ("Since there is no specifically stated or otherwise relevant federal statute of limitations for a cause of action under § 1981, the controlling period would ordinarily be the most appropriate one provided by state law."), they will not do so for statutes authorizing the government to sue on its own behalf or in furtherance of the public interest, *United States v. Beebe*, 127 U.S. 338, 344 (1888) ("The principle that the United States are not bound by any statute of limitations, nor barred by any laches of their officers, however gross, in a suit brought by them as a sovereign Government to enforce a public right, or to assert a public interest, is established past all controversy or doubt.").

In situations where the government brings suit on behalf of an individual, both furthering the public interest and vindicating the individual's rights, courts have declined to apply a statute of limitations; nevertheless, district courts may limit the availability of relief if the government unreasonably delayed in bringing its case and the delay has caused prejudice to a defendant. *See Occidental Life Ins. Co. of California v. E.E.O.C.*, 432 U.S. 355, 373 (1977) ("This Court has said that when a Title VII defendant is in fact prejudiced by a private plaintiff's unexcused conduct of a particular case, the trial court may restrict or even deny backpay relief. . . . The same discretionary power to locate a just result in light of the circumstances peculiar to the case . . . can also be exercised when the EEOC is the plaintiff.") (citations and quotation marks omitted). The Occupational Health and Safety Act of 1970 was enacted "to assure so far as possible every working man and woman in the Nation safe and healthful working conditions." 29 U.S.C. § 651(b). Section 11(c) of the act requires the Secretary of Labor to bring suit if, after receiving a complaint from an employee, he determines that the employer imposed an adverse employment action on the employee because the latter filed a complaint or testified about an unsafe working condition. 29 U.S.C. § 660(c). The court in a section 11(c) suit may order reinstatement of the employee, back pay, and other relief. *Id.* Like EEOC enforcement actions, such suits vindicate both the public interest and private rights. Accordingly, the only two Circuit Courts of Appeal that have considered the issue have held that no statute of limitations applies to OSHA retaliation claims, but that district courts have discretion to deny relief when defendants have been prejudiced by the Secretary's unreasonable delay in bringing suit. *See Marshall v. Intermountain Elec. Co.*, 614 F.2d 260, 263 (10th Cir. 1980) (citing *Occidental Life Ins.* and refusing to apply a statute of limitations for OSHA retaliation claims brought by the Secretary of Labor, but noting that "the doctrine of laches may be applied . . . to limit relief"); *Donovan v. Square D Co.*, 709 F.2d 335, 340 (5th Cir. 1983)

(refusing to apply a statute of limitations for OSHA retaliation, but noting "[i]f . . . an inordinate and inexcusable delay results in prejudice to a defendant's ability to present his defense, the district courts may restrict or even deny back pay relief").

Consistent with the Fifth and Tenth Circuits, and with the Supreme Court's reasoning in *Occidental Life Insurance*, I conclude that I have discretion to limit the relief available for OSHA retaliation claims brought by the government under 29 U.S.C. 660(c) after an unreasonable delay causing prejudice to the defendants.[1]

### 2. Defendants Are Not Entitled to Summary Judgment on the Basis of Delay

To establish their defense, the Defendants must show (1) the plaintiff's delay in bringing his claim was "unreasonable and inexcusable;" and (2) the delay "has resulted in prejudice to the defendant[s]." *Ivani Contracting Corp.*, 103 F.3d at 259. (quotation marks omitted) (describing the Second Circuit standard for laches); *see also Donovan v. Square D Co.*, 709 F.2d at 340 (noting the same factors for an undue delay defense in a section 11(c) suit). A showing of undue prejudice depends heavily on "circumstances peculiar to the case." *Occidental Life Ins. Co. of California*, 432 U.S. at 373. Laches is an affirmative defense and I treat the undue delay defense the same way. Fed. R. Civ. P. 8(c)(1). A defendant seeking summary judgment on the basis of an affirmative

---

[1] The Secretary argues that the Fifth Circuit's refusal in *Donovan v. Square D. Co.* to rely on any statute of limitations for section 11(c) claims supports the proposition that laches may not apply. (ECF No. 79 at 31.) On the contrary, while the court did not use the term "laches," it explicitly noted that district courts had discretion to deny relief in the event of undue delay causing prejudice, *Donovan v. Square D Co.*, 709 F.2d at 340 n.11. The elements that it noted would warrant such a step are the same that I consider below—namely inexcusable delay and prejudice to the defendant. I decline to decide whether the defense in this case is best described as "laches," particularly given that the Secretary seeks damages in the form of back pay for DeLeon and Espinal and laches is traditionally a defense only to equitable claims. *See generally SCA Hygiene Prod. Aktiebolag v. First Quality Baby Prod., LLC*, 137 S. Ct. 954, 960-61 (2017) (discussing the availability of laches as a defense to claims for damages).

defense bears the burden of establishing that no dispute of fact exists as to any element of the defense. *In re State Police Litig.*, 88 F.3d 111, 123 (2d Cir. 1996).

Defendants fail to carry their burden to establish that no genuine dispute of fact exists about whether the Secretary's delay in this case was "unreasonable and inexcusable." *Ivani Contracting Corp.*, 103 F.3d at 259. The Defendants assert that a six-year delay is unreasonable but offer no context for evaluating the delay in this particular case. The Secretary points to evidence in the record showing that OSHA notified Defendants about the administrative retaliation claims that DeLeon and Espinal had filed against them by October 1, 2009, less than one month after the claims were filed and less than two months after they were allegedly discharged. (56(a)2 Stmt. ¶ 48); *see Occidental Life Ins. Co.*, 432 U.S. at 372 ("Unlike the litigant in a private action who may first learn of the case against him upon service of the complaint, the Title VII defendant is alerted to the possibility of an employment suit [by the EEOC] within 10 days after a charge has been filed. This prompt notice serves, as Congress intended, to give him an opportunity to gather and preserve evidence in anticipation of a court action.") The Secretary also provides a timeline, supported by evidence in the record, delineating consistent contact between OSHA investigators and the Defendants about the retaliation claims. Highlights of the timeline are set forth below:

- September 4, 2009 – OSHA notified Defendants that DeLeon had filed a retaliation complaint.
- October 1, 2009 – OSHA notified Defendants that Espinal had filed a retaliation complaint.
- May 2010 – OSHA and Defendants signed a settlement agreement in which Eastern Awning agreed to pay a penalty of $17,500 in installments from July 2010 through May 2012 due to the conditions in the powder coat room.
- July 2011 – OSHA called Eastern Awning's attorney to discuss the retaliation claims, but was told Eastern Awning had obtained new counsel.
- August 2011 – OSHA called Eastern Awning's new attorney and exchanged emails about the retaliation claims.
- March 7, 2013 – Eastern Awning produced documents to OSHA related to the retaliation claim.

- December 2013 through December 2014 – OSHA discussed the possibility of settlement of the retaliation claims with Eastern Awning's attorney; during these discussions there were several delays due to the schedule of Eastern Awning's attorney.
- January 2015 – OSHA referred the case to the Department of Labor Solicitor's Office.
- August 2015 – The Solicitor's Office contacted Defendants' attorney to discuss settlement and notify them that litigation was anticipated.
- November 2015 – The complaint in this case was filed once it became clear that settlement was unlikely.

(Appendix to Plaintiff's Opposition to Summary Judgment, ECF No. 79 at 40.) While this timeline does not offer a model of government efficiency, it does suggest that the agency did not "sleep on [its] rights." Instead, it continued to investigate the case from the time DeLeon and Espinal filed their claims until the agency brought suit in this Court. The timeline also demonstrates that the parties were consistently in contact and that some of the delay was caused by settlement discussions that progressed slowly due in part to the schedule of Eastern Awning's counsel. Viewing the timeline in the light most favorable to the Secretary, I cannot conclude that the delay on its own entitles Defendants to judgment as a matter of law.

Defendants also fail to show undue prejudice. First, as noted above, the record shows that Defendants had notice of the retaliation claims very soon after they were filed with the agency. Notice is an important factor in determining whether a defendant was prejudiced by delay. *See Donovan v. Square D Co.*, 709 F.3d at 340 n.11. Here, Defendants were repeatedly reminded that OSHA was continuing to investigate and might prosecute. They do not claim that the suit came as surprised when it was ultimately filed. Further, they had an independent reason to gather evidence and marshal arguments to defend against a retaliation claim from the outset: Defendants had litigated DeLeon's claim of retaliation before a state agency as early as the fall of 2009. (56(a)2 Stmt. ¶ 32.) DeLeon filed for unemployment in September of 2009, and the unemployment claims administrator granted DeLeon's claim in October, finding that DeLeon was discharged for reasons other than absenteeism. (ECF No. 79-23 at 2.) Eastern Awning appealed on November 4, 2009,

and the appeals referee heard the appeal on February 16, 2010. (*Id.*) Eastern Awning was represented at the hearing by its attorney and DeLeon's supervisor. (*Id.*) The appeals referee determined that "[t]he evidence indicates that the employer had reduced hours of the claimant [DeLeon] and other employees over the past few months, *and that the employer was suspicious that the claimant filed an OSHA complaint*." (*Id.* at 5) (emphasis added). The referee concluded "that the discharge was a pretext for other issues unrelated to her attendance." (*Id.*) Defendants thus had notice of the claims against them, and they litigated the reasons for DeLeon's departure within a year of the events in the complaint.

Defendants nonetheless argue that they were prejudiced by the delay because DeLeon lost evidence that might have been relevant to this litigation. They point to evidence that DeLeon recorded some conversations with her supervisor at Eastern Awning, that she kept a journal around the time of the incident in the powder coat room, and that she saved voicemails from her supervisor. (ECF No. 74-7 at 10, 19, 23.) DeLeon was unable to provide the recordings or journal for this litigation. (ECF No. 74-5 at 7-8.) Simply pointing to missing evidence, however, is not enough to establish prejudice. Defendants provide no reason to infer that the evidence that DeLeon lost or failed to preserve would contradict, or even meaningfully supplement, the evidence already in the record. For example, the record contains interviews in which DeLeon described many of the events and conversations that she recorded. (*E.g.*, ECF No. 74-7 at 34) ("And he was like, you could hear right on the voice recording. He said, [']These are little games that Steve is trying to play with you.[']") Defendants also cite situations where DeLeon's later depositions or interviews do not align with her interviews closer to the incidents in the complaint, implying that the recording is necessary to resolve these discrepancies. They focus on one phone call between DeLeon and her supervisor at Eastern Awning in August 2009 in which the supervisor told DeLeon she could return

9

to work if she signed a warning letter acknowledging her absences. (ECF No. 81 at 10.) In her 2009 interview with the Department of Labor,[2] DeLeon stated that her supervisor told her she could return to work if she promised to sign a warning letter but she refused. (ECF No. 81-3 at 3) ("He said that Steve said I could return to work, but I have to promise to sign a written warning saying that I missed 34 days since June of last year up until the present date."). In her 2017 deposition, she testified that she refused to sign the warning letter, but could not recall whether her supervisor told her she could return to work if she did. (ECF No. 81-8 at 3.) Nevertheless, she affirmed her 2009 statement, noting "If that is what I told her in my statement, then that is what I said . . . ." (*Id.* at 4.) In short, DeLeon has provided two sworn statements on this point—years apart—that do not clearly contradict each other. In this context, asserting that the missing record would reveal inconsistencies or otherwise help the Defendants is speculation. In any event, Defendants may seek to admit DeLeon's earlier statement at trial or to cross-examine her with the statement if they believe it contradicts her testimony. Thus, Defendants have failed to show that they are prejudiced by their inability to review the recordings.

Finally, the record shows that some of the missing evidence that Defendants claim DeLeon lost is unlikely to have existed at all. Defendants assert that DeLeon took notes during an encounter with her Eastern Awning supervisor in case her audio recording was unclear. (ECF No. 75 at 19) (claiming that "Ms. DeLeon surreptitiously taped the exchange . . . She was 'taping it . . . and trying to take notes.' . . . She took the notes in case 'the tape recording wasn't good.'") (citing ECF No. 74-7 at 10). My review of the interview transcript reveals the statements they attribute to

---

[2] The interview transcript is dated 9/30/2012. (ECF No. 81-3.) The Secretary explains that the interview actually occurred in 2009 and points to evidence internal to the interview demonstrating that it occurred when Ms. DeLeon filed her section 11(c) complaint. (*See* ECF No. 79 at 2 n.1.) I find the Secretary's explanation is credible, but note that my analysis would be the same whether the interview occurred in 2009 or 2012.

10

DeLeon were actually made by the Department of Labor Investigator while interviewing Ms. DeLeon. (ECF No. 74-7 at 10.) ("Ms. Horowitz: . . . So I've got that now, I think. I mean, I'm taping it anyway, but I'm trying to take notes and make sure I understand in case the tape recording isn't, you know, that good. If there's things I don't understand, I don't want to have to keep – make you do [the interview] all over again.")

On summary judgment, I must draw all reasonable inferences in favor of the nonmoving party. *Caronia*, 715 F.3d at 427. I cannot infer that the missing evidence, to the extent it existed at all, would have supported the Defendants' case.[3] I conclude that the Defendants have not carried their burden to show the absence of any dispute of fact as to whether the delay in bringing this case caused prejudice.

### B. Substantive Retaliation Claims

Defendants next argue that they are entitled to summary judgment because DeLeon and Espinal were not terminated and because no employment action was taken in retaliation for their reporting an OSHA violation. Section 11(c) prohibits employers from discharging or discriminating against any employee because he or she has "filed any complaint or instituted or caused to be instituted any proceeding under or related to [the Act] or has testified or is about to testify in any such proceeding or because of the exercise by such employee on behalf of himself or others of any right afforded by this chapter." 29 U.S.C. 660(c). For OSHA retaliation claims, courts generally apply the burden-shifting framework set out in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *See Solis v. Blue Bird Corp.,* 404 F. App'x 412, 413 n.2 (11th Cir. 2010) ("[W]e agree that it was proper for the district court to apply the burden-shifting framework

---

[3] There has been no showing that the evidence was deliberately destroyed or that its absence was procured by the Secretary.

11

laid out in *McDonnell Douglas* [in a section 11(c) case]. . . That test has been applied in countless cases involving claims of retaliatory discharge in various employment contexts, and we see no reason not to do so here."); *Perez v. Champagne Demolition, LLC*, No. 1:12-CV-1278(FJS), 2016 WL 3629095, at *3 (N.D.N.Y. June 29, 2016) (applying *McDonnell Douglas* to a section 11(c) claim). Under the *McDonnell Douglas* framework, the Secretary must first make a *prima facie* showing of retaliation. *Champagne Demolition*, 2016 WL 3629095, at *3. The burden then shifts to the Defendants to articulate a legitimate, nonretaliatory reason for the employment action. *Id.* Finally, the Secretary must show that the Defendants' stated reason for the employment action was pretextual. *Id.*

To establish a *prima facie* case, the Secretary must show "(1) the whistleblower's participation in a protected activity, (2) a subsequent adverse action by the employer against the whistleblower employee, and (3) a causal connection between the two." *Perez v. Champagne Demolition*, LLC, No. 1:12-CV-1278, 2016 WL 3629095, at *3 (N.D.N.Y. June 29, 2016).[4]

### 1. Prima Facie Case

#### a. Adverse Action Against Espinal

There is sufficient evidence in the record to raise a genuine dispute of fact over whether Espinal suffered adverse action after reporting safety issues to OSHA. Defendants claim that there is no evidence that Espinal was terminated; they contend that, after they learned Espinal was medically cleared in late August, they informed him that he was free to return to work. In particular, they point to evidence that Espinal returned to Eastern Awning on August 31, and his

---

[4] Defendants appear to concede that reporting the conditions in the powder coat room was a protected activity, satisfying the first prong. (*See* ECF No. 75 at 24) (arguing that "Ms. DeLeon's protected activity" was not "the 'but-for' cause of her termination" without contending that reporting the conditions in the powder coat room was not a protected activity).

12

supervisor told him he could begin work on September 2. (*See* ECF No. 75 at 27) (citing ECF No. 74-7 at 32-33.) In a certified letter to Espinal dated August 26, however, Defendants had specifically instructed Espinal to return on August 31, (ECF No. 79-12 at 2), though the letter was returned as undeliverable. (56(a)1 Stmt. ¶ 15.) Defendants offer no explanation for their refusal to let Espinal work on the very day their letter had instructed him to "report . . . at [his] regular time." (ECF No. 79-12 at 2.)

The Secretary points to evidence showing that Espinal tried to return to work, but was refused. Espinal testified that he brought his medical clearance letter to Eastern Awning, but was told he could not work until he spoke to Lukos. (Espinal Dep., ECF No. 79-10 at 5.) He attempted to contact Lukos five or six times, but was repeatedly told that Lukos was "busy . . . and he stayed like that." (*Id.*) While Lukos was too "busy" to meet with Espinal, the record shows Lukos told an OSHA investigator on August 27 that "due to market conditions and business decisions, there were no employees" working in the powder coat room, and in "the upcoming months, he indicated that he would have to hire new workers" to complete powder coating. (ECF No. 79-13 ¶ 8.)

Viewing the record in the light most favorable to the Secretary, I find that a reasonable jury could conclude that (1) Defendants knew that Espinal was medically cleared for work by August 26; (2) Defendants' refusal to let him work on August 31, the day he had been invited to return in the (undelivered) letter, suggested that the offer to let him return was insincere or equivocal; (3) Defendants needed employees to work in the powder coat room; (4) Defendants knew that Espinal wanted to return to work; and (5) Defendants nevertheless refused to allow Espinal to work until he spoke with Lukos, who was consistently unavailable to meet with him in the days following August 31. "The test of whether an employee has been discharged depends on the reasonable inferences that the employee could draw from the statements or conduct of the employer." *N.L.R.B.*

*v. Champ Corp.*, 933 F.2d 688, 692 (9th Cir. 1990). Espinal's statements in his deposition suggest that he believed that his employment with Eastern Awning had been terminated. (*See* ECF No. 79-10 at 6) (explaining that he was unable to pay child support and "I had to call and tell them to stop . . . because I was out of a job," and that he felt he had "lost everything" because he had "[always] supported [himself]"). There is sufficient evidence in the record to raise a material issue of fact about whether Defendants' conduct reasonably communicated to Espinal that he had been terminated.

Finally, Defendants assert that they did not take adverse action against Espinal because they offered to reinstate him on October 19. (ECF No. 1 ¶ 48.) But Defendants made the offer only after OSHA notified them on October 1, 2009 that Espinal had filed a retaliation complaint with OSHA. (ECF No. 74-3 at 3.) "[A] retaliatory action is 'materially adverse' when the action would have been likely to dissuade or deter a reasonable worker . . . from exercising his legal rights." *Millea v. Metro-N. R. Co.*, 658 F.3d 154, 163 (2d Cir. 2011). An employer cannot nullify a retaliation claim simply by offering to undo its adverse action once the possibility of a government enforcement action looms on the horizon. Further, a subsequent offer of reinstatement does not eliminate the chill of the retaliatory act. As discussed above, a reasonable jury could conclude that Defendants had terminated Espinal in late August of 2009. The parties agree that Defendants offered to reinstate him on October 19. The risk of a nearly two-month period of unemployment would likely dissuade an employee from reporting an OSHA violation. There is thus sufficient evidence in the record for a reasonable juror to find that the Defendants took adverse action against Espinal notwithstanding their later offer to reinstate him.

### b. Adverse Action Against DeLeon

Defendants argue they did not take adverse action against DeLeon because she chose to leave Eastern Awning of her own accord, citing statements that she made in an interview with a Department of Labor investigator. (ECF No. 75 at 25-26.) The Secretary explains that the interview took place shortly after DeLeon filed her retaliation claim with OSHA, at which point she had already alleged that she had been terminated. (ECF No. 79 at 2 n.1.) The record shows that the interviewer asked DeLeon, "So what – what are you looking for? Do you want your job back there?" (ECF No. 74-8 at 7). DeLeon explained that she did not want to be reinstated because she was "afraid . . . that if [she] went back there they[ would] retaliate on [her] again" and because she did not "want to work with [her supervisor] because of sexual harassment." (ECF No. 74-8 at 7-8.) Her responses do not indicate that she chose to leave Eastern Awning voluntarily in the first instance. Rather, they explain why she was not seeking reinstatement at Eastern Awning as a remedy in her section 11(c) retaliation case. As a result, DeLeon's statements do not demonstrate that she willingly left her position with Eastern Awning.

Defendants acknowledge two other reasons that DeLeon may have left Eastern Awning: (1) "she either could not or would not produce a note explaining her absence as a result of the alleged 'mace incident,'" and (2) "she refused to sign a warning notice listing the days she had been absent in the previous eleven months" (ECF No. 75 at 26.) First, there are material disputes of fact as to whether the Defendants' refusal to allow DeLeon to work until she produced a note for her absence constituted adverse action. DeLeon testified that she told her supervisor that she could not provide documentation for her absence. (ECF No. 74-7 at 27-28.) He told her that she could not return until she did. She asked, "[D]oes that mean don't return to work, that you're letting me go?" (*Id.*) The supervisor replied that he was. (*Id.* at 28.) He also declined to correct her as he watched her packing her belongings and informing her co-workers that she had been terminated.

15

(*Id.*) The record would thus allow a reasonable juror to conclude that DeLeon was terminated from her position with Eastern Awning.

Defendants next contend that, even if DeLeon was initially told she could not work until she produced documentation, her supervisor later told her that she could return if she signed a warning. Thus, they argue, even if she was temporarily prevented from working, she was not terminated entirely. (ECF No. 81 at 2-3.) But the record contains evidence that the offer to return was subject to unreasonable conditions. Specifically, DeLeon testified that her supervisor informed her that the rescission of her termination was conditioned on her signing a warning acknowledging her absences. (ECF No. 74-8 at 3-4.) She believed that the warning would include the days she missed as a result of the medical problems she incurred while working in the powder coat room, i.e., that her employer was requiring her to acknowledge fault for absences caused by its alleged wrongdoing as a condition of her continued employment. (*Id.*) Defendants contend that the warning might not have included the days DeLeon missed following that incident, but DeLeon refused to sign the warning without ever having seen it. (ECF No. 81 at 2.) They do not cite any evidence in the record suggesting that her belief was inaccurate. At most, their contention raises a factual dispute for the jury.

Even if Defendants' conditional offer to let DeLeon return if she signed the warning did not constitute termination, there is still other evidence in the record from which a reasonable juror could find adverse action. Courts in this circuit have held that selective enforcement of employment policies can constitute adverse action for purposes of retaliation claims. *See Valenti v. Massapequa Union Free Sch. Distr.*, No. 09-cv-977 (JFB), 2010 WL 475203, at *5 (E.D.N.Y. Feb. 5, 2010) (collecting cases). The Secretary points to statements by DeLeon's supervisor indicating that Eastern Awning employees commonly failed to produce notes for doctors' visits

even when the supervisor requested them. (ECF No. 79-25 at 11-12.) The supervisor also testified that, despite frequent unexcused absenteeism among Eastern Awning employees, he knew of no employees who had been terminated for missing work in the ten years he had worked for the company. (*Id.* at 7.) Drawing all reasonable inferences in favor of the Secretary, a reasonable juror could find that Defendants selectively enforced their absenteeism policies against DeLeon, which is itself sufficient for adverse action in the retaliation context.

### c. Causal Connection Between OSHA Reports and Adverse Action

Defendants next argue that they are entitled to summary judgment even if DeLeon and Espinal were actually terminated because the Secretary cannot show that DeLeon's and Espinal's protected activities were causally related to their terminations. I disagree. "A plaintiff may establish causation either directly through a showing of retaliatory animus, or indirectly through a showing that the protected activity was followed closely by the adverse action." *Smith v. Cty. of Suffolk*, 776 F.3d 114, 118 (2d Cir. 2015).

There is sufficient evidence of Lukos's animus towards employees who complain about unsafe working conditions that a jury could find a causal link between DeLeon's and Espinal's OSHA report and their later termination. For example, an Eastern Awning employee testified that Lukos told DeLeon and Espinal to "buck it up" when they complained about the powder coat room. (Allard Interview, ECF No. 79-9 at 5.) Espinal testified that Lukos told them "that there was nothing" and accused them of "crying like babies" when they described the conditions there (Espinal Dep., ECF No. 79-10 at 3-4.) When DeLeon reported the problem, she similarly testified that Lukos told her to "stop being a crybaby about it." (ECF No. 79-1 at 6.) According to DeLeon, after she called OSHA on June 19 and then a week later went to work to pick up her check, Lukos made her wait an hour and confronted her about her reaction to the incident, asking, "Why are you

17

trying to make a big deal out of this . . . . Well, did you call OSHA?" (*Id.* at 9-10.) A jury could conclude that Lukos's disparaging comments, coupled with his complaint that DeLeon was "mak[ing] a big deal" and questioning her about calling OSHA, demonstrate animus towards employees who report health and safety concerns.

Further, to establish a prima facie case of causation, the Secretary need not present direct evidence. "Close temporal proximity between the plaintiff's protected action and the employer's adverse employment action may in itself be sufficient to establish the requisite causal connection between a protected activity and retaliatory action." *Kaytor v. Elec. Boat Corp.*, 609 F.3d 537, 552 (2d Cir. 2010). There is no "bright line to define the outer limits beyond which a temporal relationship is too attenuated to establish a causal relationship between [a protected activity] and an allegedly retaliatory action." *Summa v. Hofstra Univ.*, 708 F.3d 115, 128 (2d Cir. 2013). Accordingly, courts have found a sufficiently close temporal connection when the time between the protected activity and apparent retaliation was as little as twelve days or as long as eight months. *See Douglas v. City of Waterbury*, 494 F. Supp. 2d 112, 125 (D. Conn. 2007).

In this case, the Secretary points to evidence that DeLeon and Espinal were sickened at work as a result of an unsafe condition on June 15, and complained to Lukos about the condition the same day. (56(a)2 Stmt. ¶ 18.) Defendants admit that they knew that employees had filed health and safety complaints with OSHA related to the powder coat room by the end of June (ECF No. 1 ¶ 28; ECF No. 26 ¶ 28), and that DeLeon and Espinal were the only employees in the previous three years who were injured in the powder coat room, (*Id.* ¶¶ 29, 40). The alleged retaliatory actions occurred in late August, about two months later. While that temporal proximity alone might be sufficient to support an inference of causality, the Secretary offers evidence of an even closer connection. OSHA initially investigated DeLeon's complaint in late June. (ECF No. 79-13 ¶ 4.)

However, "a day or a few days" before August 27—i.e., on August 26 or just before—a new OSHA investigator contacted Eastern Awning to announce that he would be conducting an inspection (*Id.* ¶ 5.) Within days or hours of finding out about OSHA's renewed interest, the record shows that Lukos directed DeLeon's supervisor to prohibit DeLeon from working until she provided documentation for her absences, steps the supervisor believed were "wrong." (ECF No. 79-25 at 29-30.) Four days later, Espinal attempted to return to work but was refused. (ECF No. 74-7 at 32-33.) Such a temporally close connection is sufficient to establish a *prima facie* case that the adverse action was causally related to DeLeon's and Espinal's reporting a safety violation to OSHA.

### 2. Defendants' Neutral Explanation for Adverse Action and Pretext

Once the Secretary establishes a *prima facie* case of retaliation, the burden shifts to the Defendants to show a neutral, nonretaliatory explanation for the adverse action. Because Defendants contend that they did not take any adverse action against Espinal, they do not attempt to provide any neutral explanation for his termination. (*See* ECF No. 81 at 6-7) (arguing that Espinal was not terminated and was offered reinstatement without asserting any neutral reason for action taken against him). As to DeLeon, Defendants suggest that her history of absenteeism justifies the disciplinary actions that they took against her beginning on August 26. (ECF No. 75 at 24-25.) In his deposition, Lukos stated that he believed DeLeon was lying about the reason for her absence on July 24 and he wanted to force her to admit the truth. (ECF No. 74-2 at 6.) I find that the Secretary has identified sufficient evidence in the record to raise a genuine dispute of fact as to whether Lukos's explanation is pretextual. Specifically, the record shows that (1) Defendants admit that DeLeon was a "good worker[];" (2) employees were frequently absent for medical reasons without providing documentation and faced no significant adverse consequences, (ECF No. 79-25 at 11-12); (3) Eastern Awning had not terminated any employees in the preceding 10

years for absenteeism (*id.* at 7); (4) DeLeon's supervisor believed that requiring DeLeon to provide documentation was "wrong," and he did so only at Lukos's direction, (ECF No. 79-25 at 28-30); and (5) Lukos could articulate no basis for his belief that DeLeon was lying about the July 24 absence. (Lukos Deposition, ECF No. 79-8 at 14.)[5] Taken together, there is sufficient evidence in the record to support an inference that concerns about DeLeon's attendance were pretextual, and that the reason she was prevented from working was retaliation for filing her OSHA complaint.

**IV. Conclusion**

For the foregoing reasons, the Defendants' Motion for Summary Judgment is DENIED.

IT IS SO ORDERED.

/s/
Michael P. Shea, U.S.D.J.

Dated: Hartford, Connecticut
October 9, 2018

---

[5] Lukos stated that he could not provide a reason because it was too long ago to remember. (Lukos Dep., ECF No. 79-8 at 14.) A reasonable juror could choose to disbelieve that statement, however, given that the Defendants litigated DeLeon's unemployment claim in 2009 on the basis that she was discharged for absenteeism. (Decision of Appeals Referee, ECF No. 79-23 at 3.)